UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EXTREMELY CLEAN CLEANING SERVICES, LLC and ALISIA BURKS | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-2968 |
| CAAT, INC., an Ohio Corporation, ANAGO CLEANING SYSTEMS, INC., a Florida Corporation, ANAGO FRANCHISING, INC., a Florida Corporation, ALBERTSON FAMILY JANITORIAL HOLDINGS, INC., an Ohio Corporation, CURT ALBERTSON, an individual, COREY ALBERTSON, an individual, TERESA ALBERTSON, an individual, and DAVID R. POVLITZ, and individual. | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiffs, Extremely Clean Cleaning Services, LLC ("ECCS") and Alisia Burks ("Ms. Burks") (collectively, "Plaintiffs"), by counsel, for their Complaint for Damages and Declaratory Relief against Defendants, CAAT, Inc. ("CAAT"), Anago Cleaning Systems, Inc. ("ACS"), Anago Franchising, Inc. ("AFI"), Albertson Family Janitorial Holdings, Inc. ("AFJH"), Curt Albertson ("Curt"), Corey Albertson ("Corey"), Teresa Albertson ("Teresa") and David R. Povlitz ("David") (collectively, "Defendants") allege and state that:

**PARTIES**

1.      ECCS is an Indiana limited liability company with its principal place of business at 3412 Timbersedge Dr., #10, Indianapolis, IN 46222.

2.      Ms. Burks is an individual residing in Indianapolis, IN and is the sole owner of ECCS. Ms. Burks purchased an alleged franchise from Defendant CAAT in October 2015 and provided cleaning services throughout central Indiana from October 2015 through April 2018.

3.      CAAT is an Ohio corporation with its principal place of business at 8515 Cedar Place Dr., Suite 101, Indianapolis, IN 46240.  The address of its registered agent is 537 E. Pete Rose Way, Suite 400, Cincinnati, OH 45202. CAAT is the sub-franchisor for the following counties in Indiana: Boone; Hamilton; Hancock; Hendricks; Johnson; Madison; Marion; Morgan; and Shelby ("Indianapolis Territory"), and offers and sells single-unit Anago franchises in the Indianapolis Territory.

4.      ACS is a Florida Corporation with its principal place of business at 5203 NW 33rd Ave, Fort Lauderdale, FL 33309.  The address of its registered agent is 5485 Wiles Rd., Suite 404 Coconut Creek, FL 33073. ACS owns the Anago trademarks and proprietary business systems, which it licenses to its subsidiary, AFI, for the purpose of sublicensing the right to use these trademarks and proprietary business systems.

5.      AFI is a Florida corporation with its principal place of business at 5203 NW 33rd Ave, Fort Lauderdale, FL 33309.  The address of its registered agent is 5485 Wiles Rd., Suite 404 Coconut Creek, FL 33073. AFI offers master franchises (also referred to as sub-franchisors) worldwide for the operation of a janitorial services business.  AFI has 37 sub-franchisors (35 in the United States and 2 international).  Of these, 4 sub-franchises are operated by AFI's affiliates and 33 are operated by independent sub-franchisors.

6.      AFJH is an Ohio Corporation with its principal place of business at 7871 Palace Drive, Cincinnati, OH 45249. The address of its registered agent is 537 E. Pete Rose Way, Suite 400, Cincinnati, OH 45202.  AFJH is the parent company of CAAT.

7.      Curt is an individual residing in Cincinnati, OH and is the President of CAAT and AFJH.

8.      Corey is an individual residing in Cincinnati, OH and is the Vice President and General Manager of CAAT and AFJH.

9.      Teresa is an individual residing in Cincinnati, OH and is the Chief Financial Officer of CAAT and AFJH.

10.      David is an individual residing in Florida and is the Chief Executive Officer and Director of AFI.  Additionally, he oversees the Master Franchise Sales and is also the President, Chairman, Director and Chief Executive Officer of ACS**.**

## VENUE AND JURISDICTION

11.     Venue and jurisdiction are proper as the Parties have regularly conducted business in the Southern District of Indiana and throughout the State of Indiana by virtue of its "franchise system."

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

## FACTS

**A.   The Anago "Franchise" Model.**

13.     David began ACS in 1989 and began offering "franchises" for sale in 1991.

14.     The Anago "franchise" system operates under a purported master franchise model whereby the "sub-franchisor" purchases an exclusive territory in which to sell individual "franchises" within its territory.

15.     Currently, there are approximately 35 Anago "sub-franchisors" across the U.S. and more than 1,400 individual "franchisees."

16.     The operations of the "sub-franchisors" are controlled by way of a franchise agreement and/or development agreement and operations manual.  The "sub-franchisors" are required to strictly comply with the franchisor's standards, specifications, and written and verbal directives.  Failure to comply results in penalties including but not limited to termination of the "sub-franchisor's" right to sell Anago franchises and develop its territory.

17.     The franchisor instructs and trains its "sub-franchisors" on how to secure cleaning contracts from local businesses and assign the cleaning contracts to individual "franchisees" to assist in growing their cleaning business.

18.     The "sub-franchisor" are required to sell "franchisees" the Standard Franchisee Kit that is designated by, and purchased from, the franchisor.  The Standard Franchisee Kit includes the required equipment and chemicals that "franchisees" must use to clean accounts, as well as, branded polos/t-shirts that they are required to wear while cleaning accounts.

19.     By strictly complying with the franchisor's standards, specifications, and directives, the "sub-franchisors" earn revenue from selling the individual "franchises," selling Standard Franchisee Kits, and collecting fees on the accounts that are cleaned by the "franchisees."

20.     Fees collected by the "sub-franchisors" flow up the chain to the franchisor.  As such, all Defendants depend on and benefit and profit from the services performed by the "franchisees."

**B.  Defendants represented to Plaintiffs that they sold Anago franchises in the State of Indiana.**

21.     On or about September 2015, Defendants provided Plaintiffs with its Franchise Disclosure Document ("FDD").  A true and accurate copy of the FDD is attached hereto and incorporated by reference as Exhibit A.  Defendants represented to Plaintiffs that CAAT was the sub-franchisor for the Anago "franchise system" and that it was authorized to sell Anago franchises in the State of Indiana.

22.     Shortly after receiving the FDD, Defendants asked Ms. Burks and her mother Kearl Ash ("Ms. Ash") to work for Defendants as subcontractors until the franchise was officially purchased. Notably, Ms. Ash was not an owner or employee of ECCS, but she was treated as such by Defendants.

23.     During the time in which Plaintiffs were working as subcontractors, Defendants provided them with the Standard Franchisee Kit that is provided to Anago franchisees, which included, among other things, the same equipment to clean accounts and the authorization to clean accounts under the Anago trademark on behalf of Anago. Under the subcontractor relationship, ECCS received 65% of the value of the account and CAAT received 35%.  In other words, Defendants required Plaintiffs to clean accounts on behalf of the Anago system, utilizing its name and associated trademarks under an arrangement that included a fee of 35% to be paid back to Anago and Plaintiffs keeping 65% of the funds.  The funds were billed, collected and paid through an Anago-designed system with certain dollar amounts flowing up to Defendants.

24.     Prior to executing the franchise agreement, Defendants told Plaintiffs that if they did not execute the Franchise Agreement, then they would be required to cease cleaning the accounts and return the equipment, chemicals and polos/t-shirts to Defendants.  Additionally, any money earned by Plaintiffs by virtue of providing cleaning services to the account would be forfeited.

25.     On or about October 16, 2015, ECCS entered into a Franchise Agreement with Defendants by virtue of Ms. Ash's signature, even though she was not an owner of ECCS or authorized to enter an agreement on its behalf.  A true and accurate copy of the Franchise Agreement is attached hereto and incorporated by reference as Exhibit B.

26.     Pursuant to the terms of the Franchise Agreement, Plaintiffs were required to pay an initial franchise fee of $8,425.00.  Plaintiffs made a down payment of $2,425.00 toward the Initial Franchise Fee, with the remaining $6,000.00 to be financed by Defendants at an interest rate of 12%.  Plaintiffs were required to make monthly payments of $199.29 until the balance was paid.

27.     In addition to the Initial Franchise Fee, Plaintiffs were required to pay a Commission Fee ("C Fee") of over three times the value of the account for additional accounts that were provided to them by Defendants.  The C Fee was usually paid in 12 monthly installments.  Occasionally, Defendants would request that 20% of the C Fee be paid in advance.  Plaintiffs also had to pay a Royalty Fee equal to 24.5% of the value of the account.  For example, if an account had a value of $1,000.00, the C Fee would be $3,500, to be paid in 12 monthly installments of $291.66.  Additionally, Plaintiffs would have to pay $245.00 for this account as a Royalty Fee.  These payments would be deducted from Ms. Burks' monthly paycheck.  After the fees are deducted, Ms. Burks would net $420.84 on the account.  In the event Defendants required a 20% down payment of the C Fee on this account, which would equal $700.00, then Ms. Burks would net $55.00 on this account for the month.  Finally, in order to ensure that she received her paycheck from Defendants in a timely fashion, Ms. Burks paid what is known as a "GPO" fee in the amount of 4.25% of the gross sales for the month.  True and accurate copies of the account assumption agreements containing the breakdown of these fees for each account serviced by Plaintiffs are attached hereto and incorporated by reference as Exhibit C.

28.     From September 26, 2015 to October 16, 2015,  Defendants required Plaintiffs to operate and clean accounts on its behalf in the same manner as its franchisees and then coerced them to enter into a Franchise Agreement by threatening to keep Plaintiffs already-earned cleaning money if Plaintiffs didn't sign the Franchise Agreement.

29.     Plaintiffs were merely one of many who Defendants signed up as franchisees within the Indianapolis Market, the greater Cincinnati area, and northern Kentucky area.  All of these markets are controlled by sub-franchisors owned and operated by AFJH, Curt, Corey, and Teresa.

30.     There are at least 16 other "franchisees" that began working for Defendants as a "sub-contractor" in the Indianapolis Market alone, then sold a "franchise" just to have it all stripped away for no viable or lawful purpose.

31.     Defendants make it a practice to prey on unsuspecting hard-working individuals to clean accounts that they manage, and then significantly multiply the money owed to Defendants by requiring these individuals to sign a franchise agreement that is no more than an employee-employer situation.

32.     As a "franchisee," Plaintiffs  faced unfair competition and encroachment issues as a result of Defendants providing cleaning accounts to other "sub-contractors" or "franchisees" within the same territory.  This encroachment activity was intentional and used as a mechanism to provide their new "workers" with accounts by taking those same accounts away from their other "workers" or "franchisees."

33.     No exclusive territory is offered, and no protection was granted for Plaintiffs to operate their Anago franchise within a reasonably protected geographic area.

34.     In addition to having to worry about dealing with unlawful competition from "sub-contractors" and other purported "franchisees", Plaintiffs also had to be concerned about Defendants taking away their accounts.

35.     At one point, Plaintiffs were providing cleaning services to 29 accounts, working six days a week for approximately 10 hours each day.  See Exhibit C.

36.     But, after Plaintiffs began questioning the net amount in the monthly paychecks because the paychecks were continually shorted, Plaintiffs' accounts were taken away due to "customer complaints."  However, Defendants did not provide evidence of the alleged complaints.  On at least one occasion, Plaintiffs discussed one of the alleged complaints with the customer and was informed that no such complaint was made.

6

37.     By February 2018, Plaintiffs only had one account left because all the others had been taken away and given to "sub-contractors" hired by Defendants or other purported "franchisees."

38.     The accounts Defendants took away from Plaintiffs were given to "sub-contractors" hired by Defendants or other purported "franchisees" in the same geographic area that Plaintiffs operated in. Often times, the "sub-contractors" who take over accounts sign franchise agreements under the same duress as Plaintiffs, and operate in overlapping locations.

39.     Defendants' entire business model is premised on preying on unsuspecting hard-working individuals (mostly minorities) and then coercing them into purchasing a sham "franchise."

40.     Defendants have done this over and over and over again in the Indianapolis area and surrounding communities.  At last count, there were at least 16  different "franchisees" that were allotted the same territory or area to conduct a cleaning business in which they were all given the same clients for a period of time until they were taken away and given to the newest "franchisee" who bought into the same geographic territory.

41.     This type of "churning" activity is unlawful, but clearly evident within Defendants' franchise practices.

42.     On or around March 1, 2018, Defendants abandoned their Indiana "franchisees" by closing their Indianapolis' office without notice and by failing to fulfill their obligations to their "franchisees," including but not limited to remitting payment for services performed.  The State of Indiana has also been removed from Defendants' website as an available territory.

43.     This inequitable behavior by Defendants is a thinly veiled attempt to skirt their liability to Plaintiffs and the other "franchisees" residing in Indiana in the hope that these disenfranchised individuals will simply go away.

44.     Plaintiffs have been, and continue to be, damaged as a result of Defendants' unlawful and inequitable activity.

C. **Plaintiffs are employees of Defendants, not franchisees.**

45.     From the moment Defendants hired Plaintiffs to work as a "subcontractor" all the way through her joining as a "franchisee," she has been treated as an employee.  Defendants provide Ms. Burks with her work schedule and her clients.  She has no control over the clients' property that she cleans.  All monies from customers were paid directly to Defendants and then, some of the time, such monies made their way back to Ms. Burks in a paycheck from Defendants for services performed.

46.     Ms. Burks was required to pay an additional fee as a requirement to try and ensure that she received a bi-weekly paycheck.

47.     Despite paying these fees, Ms. Burks often times did not receive a timely check and/or was shorted money that she was owed.  For example, Ms. Burks did not receive a paycheck for her last three months of employment (February – April 2018).  To date, Ms. Burks still has not received a paycheck for these months.

48.     Ms. Burks had virtually no control over any aspect of her business.  The customer accounts, operations, accounts payable, accounts receivable, and virtually every other aspect of running her "franchise" was controlled by Defendants.

49.     Defendants instructed Ms. Burks on how to do her work and dictated her performance and the details of her job.

50.     Never as part of the "franchise" did Ms. Burks work in an independently established trade, occupation, profession, or business.

51.     Additionally, Defendants control the finances and collect monies directly from the customer accounts.  After the monies are collected from the customers, any and all fees, commissions, royalties, penalties, etc. that Defendants determine they are owed are subtracted from those payments.  All Defendants receive some portion of the fees that are subtracted from Ms. Burks' paycheck.

52.     The remaining funds, if any, are remitted to Ms. Burks on a monthly basis.

53.     To retrieve her paycheck, Ms. Burks would either go to Defendants' Indianapolis' office to pick up her paycheck, or it was mailed to her.

54.     Despite the funds being directly in Defendants' control and Ms. Burks paying the GPO Fee to ensure timely payment, there were several months when Ms. Burks' paycheck was late, and at least three months (February – April 2018) where she did not receive a paycheck at all.  Additionally, Ms. Burks' paychecks were almost always short and required her to invest her time and energy to discuss these issues with Defendants.

55.     To discuss the payment issues with Defendants, Ms. Burks often had to travel to Defendants' Cincinnati office to meet with representatives.  Occasionally, her persistence and discussions resolved the issue for a certain month, but on many occasions, she was ignored or given the runaround.  More often than not, she was not remitted the difference between what she received and what she was actually owed, and she did not receive the total value of her services.

56.     Regardless of the label Defendants place on the relationship, the reality of the circumstances demonstrate that Ms. Burks has been misclassified as an independent franchisee instead of an employee and Defendants are joint employers of Ms. Burks.  Not only is this a violation of the Fair Labor Standards Act ("FLSA") and the Indiana Wage Payment Act, it is also a violation of the Indiana Franchise Disclosure Act.

57.     Defendants have orchestrated a business scheme to misclassify their workers in an attempt to avoid providing them with the protections afforded by the FLSA and the Indiana wage and hour laws concerning guaranteed minimum wages, overtime pay, other wage protections, and other benefits of employment, such as eligibility for unemployment and workers' compensation.

58.     Because of the misclassification of Ms. Burks, she has not been provided the proper wage and hour protections under federal and state law.  Ms. Burks estimates that she worked approximately six days a week for at least 10 hours a day, but did not receive overtime pay or other wage protections in connection with the services she provided.  As such, Ms. Burks was underpaid for the value of her services.

59.     Furthermore, Ms. Burks has paid approximately $150,345.83 in fees to Defendants from October 2015 to the present.  These payments constitute improper wage deductions.  Had Ms. Burks been properly classified as an employee, she would not have paid these excessive franchise fees each month.

True and accurate copies of the financial statements, referred to as Franchisee Owner Statements, provided to Ms. Burks that show the fees she paid and her take home pay for each month are attached hereto and incorporated by reference as Exhibit D.

60.     Defendants' misclassification of Ms. Burks as an independent franchisee, instead of an employee, has caused her substantial damage and is a violation of the FLSA, the Indiana Wage Payment Statute, and the Indiana Deceptive Franchise Practices Act.

## COUNT I
## DECLARATORY RELIEF

61.     Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 59 hereof.

62.     During all times relevant to this action, Defendants exert such extensive control over the customer accounts, trademarks, cash flow, and operations, that, as a matter of economic reality, an employer – employee relationship exists between Ms. Burks and the Defendants, despite Defendants' claim that their relationship is one of a franchisor and franchisee.

63.     Furthermore, all Defendants depend on and benefit and profit from the services performed by the "franchisees."

64.     Plaintiffs seek an order from the Court declaring that Plaintiffs are employees of Defendants.

## COUNT II
## VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §201

65.     Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 63 hereof.

66.     Defendants are "employers" pursuant to 29 U.S.C. §203(d) of the FLSA.

67.     Defendants are an "enterprise" pursuant to 29 U.S.C. S203(r) of the FLSA.

68.     Defendants are an enterprise "engaged in commerce" pursuant to 29 U.S.C. § 203(s) of the FLSA.

69.     Defendants are a single enterprise "engaged in commerce" pursuant to 29 U.S.C. § 203(r)(1).

70.     During all times relevant to this action, Defendants are a single enterprise engaged in commerce as defined in 29 U.S.C. §§ 203(r) and 203(s) in that Defendants have been engaged in commerce or in the production of goods for commerce and has employees engaged in commerce or in the production of goods for commerce, or that handle, sell, or otherwise work on goods or materials that have been moved in or produced for commerce; and has an annual gross volume of sales made or business done in excess of $500,000.

71.     Ms. Burks is an "employee" pursuant to 29 U.S.C. §203(e)(1) of the FLSA and performed services within Defendants' usual course of business.

72.     The Defendants exert such extensive control over the customer accounts, trademarks, cash flow, and operations, that, as a matter of economic reality, an employer – employee relationship exists between Ms. Burks and the Defendants, despite Defendants' claim that their relationship is one of a franchisor and franchisee.

73.     As Employers, Defendants must comply with the FLSA and its record-keeping requirements.  Defendants violated the provisions of sections 11(c) and 15(a)(5) of the FLSA in that they failed to make, keep, and preserve adequate and accurate records of employees and the wages, hours and other conditions and practices of employment maintained by them as prescribed by regulations duly issued pursuant to authority granted in the FLSA and found in 29 C.F.R. Part 516.

74.     Defendants failed to maintain and preserve payroll or other records regarding each employee containing the name, address, date of birth, and sex and occupation in which each employee is employed.

75.     Defendants failed to maintain a weekly record of hours worked, including any hours worked in excess of 40 hours in a workweek.

76.     At all times pertinent hereto, Defendants failed to comply with 29 U.S.C. §§ 201-219 in that no provision was made to properly pay Ms. Burks for the hours of service she performed on behalf of Defendants.

77.     Because of Defendants' willful and intentional violations of the FLSA, Ms. Burks has been, and continues to be, damaged as a result of such violations, and is entitled to recover damages, plus incurred costs and reasonable attorneys' fees, as well as liquidated damages for the years that she was employed by Defendants.

## COUNT III
## VIOLATION OF THE INDIANA WAGE PAYMENT STATUTE

78.     Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 76 hereof.

79.     Under the Indiana Wage Payment Statute, "every person, firm, corporation, limited liability company, or association…doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee…Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment."  Ind. § 22-2-5-1.

80.     Defendants are an employer pursuant to the Indiana Wage Payment Statute and must comply with its requirements.

81.     Despite Defendants' claim that a franchisor – franchisee relationship existed between them and Ms. Burks, Defendants exert such extensive control over the customer accounts, cash flow, and operations, that for all intents and purposes, Ms. Burks is an employee of Defendants.

82.     Defendants violated the provisions of the Indiana Wage Payment Statute because they failed to pay Ms. Burks properly for the hours she worked on behalf of Defendant and unlawfully deducted excessive "franchise fees" from her paychecks.   Such fees are estimated to equal approximately $150,345.83 from October 2015 to the present.  Ms. Burks estimates that she worked approximately six days a week for at least 10 hours a day, but did not receive overtime pay or other wage protections in connection with the services she provided.  As such, Ms. Burks was underpaid for the value of her services.

83.     Additionally, Ms. Burks did not receive payment for at least three months (February – April 2018) for services she performed.  Failure to pay Ms. Burks the amount owed to her for services performed is a violation of the Indiana Wage Payment Statute.

84.     Because of Defendants' willful and intentional violations of the Indiana Wage Payment Statute, Ms. Burks has been, and continues to be, damaged as a result of such harm, and she is entitled to recover damages, plus incurred costs and reasonable attorneys' fees, as well as liquidated damages for the years that she was employed by Defendants.

**COUNT IV**
**FRANCHISE FRAUD IN VIOLATION OF INDIANA FRANCHISE DISCLOSURE LAW, IND. CODE § 23-2-2.5**

85.     Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 83 hereof.

86.     Under Ind. Code § 23-2-2.5-27, "[i]t is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly: (1) To employ any device, scheme or artifice to defraud; (2) To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or (3) To engage in any act which operates or would operate as a fraud or deceit upon any person."

87.     Furthermore, "every person who materially aids or abets in an act or transaction constituting a violation of the [Indiana Franchise Disclosure Law] is also liable jointly and severally to the same extent as the person whom he aided and abetted."  Ind. Code § 23-2-2.5-29.

88.     Defendants knowingly and intentionally employed a scheme to fraudulently induce Plaintiffs into purchasing a "franchise" by providing her with a FDD and specifically representing the opportunity as a franchise.

89.     The relationship between Plaintiffs and the Defendants was not one of a franchisor –
franchisee as alleged by Defendants, but rather was an employer – employee relationship due to the amount
of control the Defendants exert over the customer accounts, trademarks, cash flow, and operations.

90.     Curt, Corey, and Teresa by virtue of their positions with CAAT and AFJH; ACS, as the
owner of the trademarks and system; AFI, as the "franchisor"; AFJH, as the parent company of CAAT; and
David, by virtue of his positions with AFI and ACS, materially aided and abetted Defendants into
fraudulently inducing Plaintiffs into purchasing a franchise.

91.     This scheme was put in place to willfully sell purported franchises to unsuspecting
individuals like Ms. Burks as a way for Defendants to avoid providing its employees with the protections
afforded by the Indiana wage and hour laws concerning guaranteed minimum wages, overtime pay, other
wage protections, and other benefits of employment, such as eligibility for unemployment and workers'
compensation.

92.     Defendants knew that Plaintiffs would rely on the information in the FDD and provided to
them by Defendants that misrepresented the job as a franchise opportunity.  Plaintiffs relied on the
Defendants' misrepresentations when the Franchise Agreement was signed and when the Initial Franchise
Fee, royalty fees, and other franchise fees were paid.

93.     Because of the Defendants' fraudulent misrepresentations, Plaintiffs have been, and
continue to be, harmed and Plaintiffs are entitled to recover damages, including consequential and punitive
damages, plus incurred costs and reasonable attorneys' fees.

## COUNT V
## VIOLATION OF INDIANA DECEPTIVE FRANCHISE PRACTICES ACT, IND. CODE § 23-2-2.7

94.     Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through
92 hereof.

95.     Under Ind. Code § 23-2-2.7-1(2), It is unlawful for any franchise agreement entered into between any franchisor and a franchisee in Indiana to permit the franchisor to compete unfairly with the franchisee within a reasonable area if no exclusive territory is granted to the franchisee.

96.     Section 1.2 of the Franchise Agreement grants Plaintiffs a non-exclusive territory.

97.     Plaintiffs were one of several purported franchises and sub-contractors that provided services with Boone, Hamilton, Hancock, Hendricks, Johnson, Madison, Marion, Morgan, and Shelby counties.  In fact, Defendants entire business model appears to be premised on churning purported franchisees in the same geographic area in order to make money over and over and over again from the same accounts, the same territories, and from all of the various fees.

98.     Moreover, Defendants took accounts from Plaintiffs and gave these accounts to other purported franchisees or sub-contractors in the same geographic area that Plaintiffs operated in so that Defendants could satisfy their obligation to provide purported franchisees with the guaranteed level of income that was promised to them.  As such, several purported franchisees provided the same services in overlapping territories in violation of the Indiana Deceptive Franchise Practices Act.

99.     This unlawful competition is exactly the type of activity the Indiana Deceptive Franchise Practices Act aims to protect against.  Permitting such unlawful competition not only violates the statute, but also violates public policy.

100.    Because of the Defendants' violation of the Indiana Deceptive Franchise Practices Act, Plaintiffs have been, and continue to be, damaged, and Plaintiffs are entitled to recover damages, including consequential and punitive damages, plus incurred costs and reasonable attorneys' fees.

**COUNT VI**
**COMMON LAW FRAUD**

101.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1 through 99 hereof.

102.    Defendants knowingly and intentionally employed a scheme to fraudulently induce Plaintiffs into purchasing a "franchise" by providing her with a FDD and specifically representing the opportunity as a franchise.

103.    The relationship between Plaintiffs and the Defendants was not one of a franchisor – franchisee as alleged by Defendants, but rather was an employer – employee relationship due to the amount of control the Defendants exert over the customer accounts, trademarks, cash flow, and operations.

104.    This scheme was put in place to unlawfully sell purported franchises to unsuspecting individuals like Ms. Burks as a way for Defendants to avoid providing its employees with the protections afforded by the Indiana wage and hour laws concerning guaranteed minimum wages, overtime pay, other wage protections, and other benefits of employment, such as eligibility for unemployment and workers' compensation.

105.    Defendants knew that Plaintiffs would rely on the information in the FDD and provided to them by Defendants that misrepresented the job as a franchise opportunity.  Plaintiffs relied on the Defendants' misrepresentations when the Franchise Agreement was signed and when the Initial Franchise Fee, royalty fees, and other franchise fees were paid.

106.    Because of the Defendants' fraudulent misrepresentations, Plaintiffs have been, and continue to be, harmed and Plaintiffs are entitled to recover damages, plus incurred costs and reasonable attorneys' fees, as well as consequential damages as a result of such harm.

**COUNT VII**
**CONVERSION**

107.    Plaintiffs incorporate by reference herein the allegations set forth in Paragraphs 1 through 105 hereof.

108.    It is unlawful for a person to knowingly or intentionally exert unauthorized control over property of another person.  Such unauthorized control constitutes conversion. Ind. Code 35-43-4-3(a).  If the property unlawfully converted is money, it must be a determinate sum with which the defendant was entrusted to apply to a certain purpose.

109.     A person that suffers "a pecuniary loss as a result of conversion is permitted to bring a civil action to recover an amount that does not exceed three times the actual damage suffered as a result of the conversion, the costs of the action, reasonable attorneys' fees, and all other reasonable costs of collection. Ind. Code § 34-4-30-1.

110.     Defendants collected monies from customer accounts that were intended to be paid to Plaintiffs for their services.

111.     Furthermore, Ms. Burks did not receive payment for at least three months (February – April 2018) for services she performed.

112.     Despite Defendants collecting this money and being entrusted with the money for a particular purpose, Plaintiffs did not receive the money that was owed to them for performing services on behalf of Defendants.  Therefore, Defendants have unlawfully converted Plaintiffs' property in violation of Ind. Code 35-43-4-3(a).

## COUNT VIII
## BREACH OF CONTRACT

113.     Plaintiffs incorporate by reference herein the allegations set forth in Paragraphs 1 through 112 hereof.

114.     On or about October 16, 2015, ECCS entered into a Franchise Agreement with Defendants by virtue of Ms. Ash's signature, even though she was not an owner of ECCS or authorized to enter an agreement on its behalf.

115.     Pursuant to the terms of the Franchise Agreement, Plaintiffs paid an Initial Franchise Fee, a Commission Fee, Royalty Fees, and a GPO Fee. The GPO Fee was specifically made to ensure that Plaintiffs received their payment from Defendants on the 20th of each month.

116.     Section 3.2 of the Franchise Agreement states:

> The Royalty Fee, Administration Fee, Advertising Contributions and C-Fee will be deducted by Us by the 20th day of each month during the Term for the previous month. Checks will be mailed by USPS. Your check of the net Gross Revenue on the 20th of the month. Your statement will be mailed to you no later than five days if You have not picked

it up. You will be paid up to the *last* day of actual service to the Client if the Account is lost or transferred. All other amounts due to Us from You will be paid at this time. If no time is specified, these amounts are due upon receipt of an invoice from Us. Any payment We do not actually receive on or before the due date is overdue.

117.     Defendants collected monies from customer accounts that were intended to be paid to Plaintiffs for their services, but despite paying the GPO fee to ensure timely payment, there were several months when Ms. Burks' paycheck was late, and at least three months (February – April 2018) where she did not receive a paycheck at all.  Additionally, Ms. Burks' paychecks were almost always short and required her to invest her time and energy to discuss these issues with Defendants.

118.     For the purpose of this Count, Plaintiffs plead, in the alternative, that failure to pay Plaintiffs by the 20th of each month in the correct amount, or at all, is a breach of Section 3.2 of the Franchise Agreement.

119.     Due to Defendants' breach of the Franchise Agreement, Plaintiffs have been, and continue to be, harmed and Plaintiffs are entitled to recover damages, plus incurred costs and reasonable attorneys' fees pursuant to Section 18.9 of the Franchise Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Extremely Clean Cleaning Services, LLC and Alisia Burks by counsel, respectfully request that the Court:

a.     Enter a Declaratory Judgment that Plaintiffs are employees of Defendants;

b.     Enter a monetary judgment against Defendants, jointly and severally, ordering Defendants to refund all fees paid by Plaintiffs to Defendants in connection with the Anago franchise, punitive damages, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit, and any further relief that this Court deems just and proper as a result of the fraudulent inducement;

c.     Enter a monetary judgment against Defendants, jointly and severally, ordering Defendants to refund all fees paid by Plaintiffs to Defendants in connection with the Anago franchise, punitive damages, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit, and any further relief that this

Court deems just and proper as a result of the violation of the Indiana Franchise Disclosure Act and the Indiana Deceptive Franchise Practices Act;

        d.        Enter a monetary judgment against Defendants, jointly and severally, for Ms. Burks' unpaid wages, including any other payments due to her for the hours worked for which she has not been properly compensated, liquidated damages, punitive damages, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit, and any further relief that this Court deems just and proper pursuant to the Fair Labor Standards Act and/or the Indiana Wage Payment Statute;

        e.        Enter a monetary judgment against Defendants, jointly and severally, in an amount not to exceed three times Plaintiffs' actual damage suffered as a result of Defendants' unlawful conversion of Plaintiffs' property; and

        f.        Alternatively, enter a monetary judgment against Defendants, jointly and severally, for Ms. Burks' unpaid wages, reasonable attorneys' fees and costs of suit pursuant to Section 18.2 of the Franchise Agreement, and any further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiffs Extremely Clean Cleaning Services, LLC and Alisia Burks by counsel, hereby demand a jury trial on all issues so triable.

        Respectfully submitted,

        */s/ Josh F. Brown*        
        Josh Brown, Attorney No. 26672-49
        Stephanie Maris, Attorney No. 32060-64
        Law Office of Josh F. Brown, LLC
        12821 E. New Market Street, Suite 250
        Carmel, IN 46032

        *Attorneys for Plaintiffs, Extremely Clean Cleaning Services, LLC and Alisia Burks*