UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EXTREMELY CLEAN CLEANING SERVICES, LLC, ALISIA BURKS, <br><br> Plaintiffs, <br><br> v. <br><br> CAAT, INC. an Ohio Corporation, ANAGO CLEANING SYSTEMS, INC. a Florida Corporation, ANAGO FRANCHISING, INC. a Florida Corporation, ALBERTSON FAMILY JANITORIAL HOLDINGS, INC. an Ohio Corporation, CURT ALBERTSON an individual, COREY ALBERTSON an individual, TERESA ALBERTSON an individual, DAVID R. POVLITZ, <br><br> Defendants. | No. 1:18-cv-02968-SEB-MJD |

**ORDER ON PENDING MOTIONS SETTING TRIAL (DKTS. 13, 23, 25, 29)**

Now before the Court are two motions filed by Defendants seeking to stay these proceedings pending arbitration. Dkts. 13, 29.[1] *See* 9 U.S.C. § 3. There is no motion for an order compelling Plaintiffs to arbitrate in the first instance, *see* 9 U.S.C. § 4, but "[a] defendant who wants arbitration is often content with a stay, since that will stymie the plaintiff's effort to obtain relief unless he agrees to arbitrate." *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 389 (7th Cir. 1995). The parties' dispute at this

---

[1] There are also collateral motions relating to Plaintiffs' submission of an unsigned affidavit. Dkts. 23, 25.

1

juncture obviously turns on the necessity of arbitration itself rather than merely the propriety of a stay. We therefore construe the motions to stay as motions to compel and to stay. *Hill v. Lynch Chevrolet, Inc.*, 349 F. Supp. 2d 1118, 1118–19 (N.D. Ill. 2004).

As explained below, Defendants' motions to stay are granted in part. We defer decision on the remaining issues until the trier of fact determines whether the parties have agreed to arbitration.

## **Background**

Plaintiffs are Alisia Burks ("Burks") and her limited liability company, Extremely Clean Cleaning Services, LLC ("Extremely Clean"). Defendants are franchisors and subfranchisors of a cleaning business. We assume the parties' familiarity with the facts, such as they are reflected in the complaint, its various attachments, and Burks's affidavit, but we restate the most relevant assertions here in the light most favorable to Plaintiffs.

Extremely Clean, through Burks, proposed to purchase a cleaning franchise from Defendants. On October 15, 2015, Burks informed Defendants' agent in Indianapolis, Brian Burton ("Burton"), that Burks's mother, Kearl Ash ("Ash"), was being dispatched to Defendants' Indianapolis office on Extremely Clean's behalf to pay the required franchise fee. Ash's signature had previously appeared on a prior contract between Extremely Clean and Defendants and some related documents, but Ash was not a member, manager, or employee of Extremely Clean and had no authorization to act on its behalf.

Burks avers that she made clear to Burton that she was not yet prepared to execute the offered contract to purchase the franchise ("the Franchise Agreement"). Burks sought

additional time to review the contract's terms with Burton "to make sure [she] fully understood what [she] was signing." Burks Aff. ¶ 21. Burton agreed that Ash could deposit the franchise fee and Burks could review the Franchise Agreement with him and execute it later in the week. Burton represented he would schedule a time for him and Burks to meet.

In depositing the franchise fee, however, Ash also signed the Franchise Agreement, purportedly on behalf of Extremely Clean but for reasons that have not been explained. There is no record of how or why Ash came to do so, nor why Burton permitted or induced her to sign, particularly since to do so was against Burks's contrary instructions to Burton. At that time, Ash was allegedly contemplating purchasing her own franchise from Defendants, which may have generated confusion on one or both sides, but we speculate as to that.

As soon as Ash informed Burks that she had signed the Franchise Agreement, Burks called Burton to inform him that Ash had no authority to execute the Franchise Agreement on Extremely Clean's behalf. Burton thus invited Burks to come to his office the next day to review the terms of the Franchise Agreement and "redo the paperwork." *Id.* ¶ 17. Burks agreed and went to Burton's office the following day, but Burton failed to appear as scheduled. Reached by telephone, Burton promised to deliver a new contract to Burks at a later time. Neither Burton or any other of Defendants' agents ever did so.

Eventually, Burks let the matter drop. For the next two years, Burks cleaned properties as Defendants' franchisee, sometimes working sixty hours per week and often, unusually, in competition with other of Defendants' franchisees. Over the course of that

period, Burks signed a series of "account assumption agreements," whereunder Extremely Clean agreed to assume client accounts from Defendants "subject to the terms of the Franchise Agreement[.]" *E.g.,* Dkt. 1 Ex. C, at 1. Again unusually, payment for the franchisees' services were remitted directly by the clients to Defendants, who then paid their franchisees. Burks was sometimes paid late, sometimes not at all, and often less than Burks believed she was owed.

In March 2018, Defendants abandoned their Indianapolis business without notice to their franchisees, including Burks. This lawsuit followed. The Franchise Agreement contains an arbitration clause, Dkt. 1 Ex. B, at 63–64, which Defendants now seek to enforce against Plaintiffs. The issue now before the Court is whether the Franchise Agreement has been agreed to by the parties sufficiently to render it enforceable.

## **Analysis**

The Federal Arbitration Act (FAA) provides,

> If any suit . . . be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . .

9 U.S.C. § 3. The FAA provides further,

> A party aggrieved by the alleged . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [with jurisdiction] . . . for an order directing that such arbitration proceed . . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the

> court shall make an order directing the parties to proceed to arbitration . . . . If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default . . . , the court shall hear and determine such issue.

*Id.* § 4.

"[A]rbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (citing 9 U.S.C. § 4; *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909–10 (7th Cir. 1999)).

Here, the second and third elements are undisputed. As to the second, the Franchise Agreement's arbitration clause covers "all controversies, disputes, or claims" touching the Franchise Agreement, including the scope and validity of the Franchise Agreement and its arbitration clause. Dkt. 1 Ex. B, at 63. As to the third, the arbitration clause is mandatory. *Id.* at 64 ("must be submitted"). *See Van Jackson v. Check 'N Go of Ill., Inc.*, 193 F.R.D. 544, 549 (N.D. Ill. 2000) (distinguishing elective and mandatory arbitration clauses). Plaintiffs have demonstrated their refusal to submit to arbitration by filing this lawsuit and by their opposition to Defendants' motions to stay. *See Hill v. Lynch Chevrolet, Inc.*, 349 F. Supp. 2d 1118, 1118 (N.D. Ill. 2004).

The first element, however, is much disputed, and that dispute is properly before us now. Because arbitration is a matter of agreement, the Court, and not the arbitrator, decides whether an agreement to arbitrate was made. 9 U.S.C. § 4; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–300 (2010); *Janiga v. Questar Corp.*, 615

F.3d 735, 741–42 (7th Cir. 2010). "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The Rule 56 standard, Fed. R. Civ. P., is applied to determine whether such trial is warranted. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (citations omitted).

I. **Indiana Law Controls Whether an Arbitration Agreement Was Made**

State law controls the contract-formation question before us. *Janiga*, 615 F.3d at 742 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). But which state's law? A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941). In contract cases, Indiana ordinarily honors the parties' choice of law, where one is expressed. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002). But "[a] contract's choice-of-law provision may not apply . . . if there is some . . . issue as to the validity of the very formation of the contract." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) (citing *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1081–82 (7th Cir. 1986), *abrogated on other grounds*, *Hart v. Schering-Plough Corp.*, 253 F.3d 272 (7th Cir. 2001)). "[B]efore [a court] can [determine whether the parties have a valid contract], it must decide which state's law applies to the issue of contract formation. Only if the court finds a valid contract may it turn to [a] choice of law provision in the [contract] . . . ." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1006 (N.D. Ill. 2017) (quotation marks and citation omitted).

In the absence of effective party choice, Indiana applies the law of the state having the "'most intimate contact'" with the transaction. *Nat'l Union Fire Ins. Co. of*

6

*Pittsburgh, Pa. v. Standard Fusee Corp.*, 940 N.E.2d 810, 814 (Ind. 2010) (emphasis omitted) (quoting *W.H. Barber Co v. Hughes*, 63 N.E.2d 417, 423 (Ind. 1945)). Factors applicable in determining which state has the most intimate contact with the transaction include: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*

The applicable factors (all but one) point to Indiana selecting its own law here. If there was a contract, it was executed (and, if at all, "negotiated") in Indiana; it was to be performed in Indiana; its subject matter was property located in Indiana; Burks is an Indiana domiciliary; and Extremely Clean is an Indiana limited liability company.

## II. Whether an Arbitration Agreement Was Made Is Genuinely Disputed

On the face of the complaint and its attachments, there is no contract between Defendants and Extremely Clean. Extremely Clean is not bound by the Franchise Agreement because its only agent with authority—Burks—did not sign it. Ash signed the Franchise Agreement but had no agency relationship with Extremely Clean. Thus, lacking any objective signs of agreement, *see Am. United Life Ins. Co. v. Rest. Hosp. Ass'n of Ind.*, 898 N.E.2d 419, 425 (Ind. Ct. App. 2008), without more, no contract between Extremely Clean and Defendants was formed when Ash signed the Franchise Agreement.

Against this conclusion, Defendants invoke the doctrines of apparent authority, ratification, and equitable estoppel. As above, state law (here, Indiana law) "govern[s]

whether a contract, including an arbitration agreement, is enforceable . . . against a non-party." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, (2009)). Waiver, estoppel, and agency are "among those state law principles" that may be applied to find an enforceable contract. *Id.* at 753 (citing *Arthur Andersen*, 556 U.S. at 631; *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005) (applying Wisconsin equitable estoppel doctrine)). *See also Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) (applying Illinois equitable estoppel doctrine).

  A. *Apparent Authority*

As defined by Indiana courts,

> "Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal. The necessary manifestation is one made by the principal to a third party, who in turn is instilled with a reasonable belief that another individual is an agent of the principal. It is essential that there be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship."

*Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 676–77 (Ind. 2001) (citations omitted) (quoting *Pepkowski v. Life of Ind. Ins. Co.*, 535 N.E.2d 1164, 1166–67 (Ind. 1989)). "[Q]uestions of the existence and scope of an agency relationship are questions of fact." *Comm'g Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 794 (S.D. Ind. 2015) (Pratt, J.) (citing *inter alia Quality Foods, Inc. v. Holloway Assocs. Prof'l Eng'rs & Land Surveyors, Inc.*, 852 N.E.2d 27, 33–34 (Ind. Ct. App. 2006)).

8

Whether Ash had apparent authority to bind Extremely Clean is genuinely disputed. Specifically, no evidence or allegation of fact establishes that *Burks* ever manifested Ash's authority on behalf of Extremely Clean to Defendants. While Ash's signature does appear on certain documents prior to her signing the Franchise Agreement, it is not clear that those signatures represent Burks's communications to Defendants rather than Ash's. The reasonableness of any reliance on Defendants' part on Ash's prior signatures is further called into question by Burks's representations to Burton prior to Ash's signing the Franchise Agreement that Ash was responsible only for delivering the franchise fee, and by Burks's representations to Burton immediately thereafter that Ash was not in fact authorized to contract on behalf of Extremely Clean.

### B. *Equitable Estoppel*

As the Indiana courts have explained, "All [estoppels] are based on the same underlying principle: 'one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other.'" *Lockett v. Planned Parenthood of Ind., Inc.*, 42 N.E.3d 119, 135 (Ind. Ct. App. 2015) (quoting *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. 2001)). "Equitable estoppel is available only as a defense." *Id.* (citing *Town of New Chicago v. City of Lake Station*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010)). "'The party [asserting] equitable estoppel must show its (1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position

9

prejudicially.'" *Id.* at 136 (quoting *Money Store Inv. Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind. 2006)).

Crediting Burks's account, Defendants have not shown their entitlement to estoppel. Defendants have not shown a lack of knowledge of the material facts, for Defendants' own agent represented to Burks that the agreement signed by Ash would be set aside and re-executed. Nor have Defendants shown a prejudicial change in position. Indeed, crediting Plaintiffs' allegations, Defendants repeatedly failed to change their position in a manner prejudicial to themselves by repeatedly failing to perform under the contract they now insist Plaintiffs must stand upon.

Moreover, it was Defendants' stonewalling of Burks (again, crediting Burks's account) that prevented her from ever executing a properly binding Franchise Agreement. Estoppel is not available under these circumstances. "'[E]quity will not permit a wrongdoer, while retaining the fruits of his wrong, to interpose an act, intentionally and wrongfully induced by him, as an estoppel against the injured party in an action for redress. One seeking equity must be able to show that he himself has clean hands.'" *Rushville Nat'l Bank of Rushville v. State Life Ins. Co.*, 1 N.E.2d 445, 450 (Ind. 1936) (quoting *Whitesell v. Strickler*, 78 N.E. 845, 850 (Ind. 1906)). *See Bayview Loan Serv'g, LLC v. Golden Foods, Inc.*, 59 N.E.3d 1056, 1070 n.11 (Ind. Ct. App. 2016).

Indiana courts have also recognized a line of authority evolved from arbitration cases specifically. "[U]nder th[is] doctrine of equitable estoppel, a nonsignatory to an agreement may bind a signatory to an arbitration clause." *German Am. Fin. Advisors & Trust Co. v. Reed*, 969 N.E.2d 621, 628 (Ind. Ct. App. 2012) (citing *Williams v.*

*Orentlicher*, 939 N.E.2d 663, 670 (Ind. Ct. App. 2010)). That authority is not on point here, however, as Indiana has so far refused to apply it to bind nonsignatories like Burks and Extremely Clean. *Williams*, 939 N.E.2d at 670–71 (Ind. Ct. App. 2010) ("It is not, as [signatory defendants] suggest, a mere coincidence that the cited case law only invokes estoppel when a nonsignatory seeks relief. The nonsignatory is the party that must make the request, because it is the party not bound by the contract.").

    C.    *Ratification*

As defined by Indiana Courts,

> Ratification means the adoption of that which was done for and in the name of another without authority. It is in the nature of a cure for [lack of] authorization. When ratification takes place, the act stands as an authorized one, and makes the whole act, transaction, or contract good from the beginning. Ratification is a question of fact, and ordinarily may be inferred from the conduct of the parties. The acts, words, silence, dealings, and knowledge of the principal, as well as many other facts and circumstances, may be shown as evidence tending to warrant the inference or finding of the ultimate fact of ratification. Knowingly accepting benefits of an unauthorized employment amounts to a ratification of such contract of employment, and is in the nature of an estoppel to deny the authority to make such contract. Ratification by a corporation may be shown by conduct, without any formal action of its board of directors. Corporations act only by and through their officers and agents, and ratification may be inferred from affirmation, or from passive acquiescence or from the receipt of benefits with knowledge.

*Nat'l Life Ins. Co. v. Headrick*, 112 N.E. 559, 561 (Ind. App. 1916) (citations omitted), quoted in, e.g., *Guideone Ins. Co. v. U.S. Water Sys. Inc.*, 950 N.E.2d 1236, 1242 (Ind. Ct. App. 2011). "Knowledge of all the material facts by the person to be charged with the unauthorized acts of another is an indispensable element of ratification." *Guideone Ins.*

11

*Co.*, 950 N.E.2d at 1242 (citing *Beneficial Mortg. Co. of Ind. v. Powers*, 550 N.E.2d 793, 796 (Ind. Ct. App. 1990)).

Whether Extremely Clean ratified the Franchise Agreement through Burks is genuinely disputed. Specifically, Burks's knowledge of "all the material facts," *id.*, included her knowledge (if her account is credited to the hilt) that Defendants had agreed to disregard the Franchise Agreement signed by Ash and to "redo the paperwork" once Burks had had the opportunity to review it with them. Thus, even accepting Defendants' liberal construction of the "benefits" Burks purportedly received under the Franchise Agreement (risking disregard of the principle that a court of equity looks to substance and actual benefit rather than to form and nominal benefit, *see Nat'l City Bank of Evansville v. Bledsoe*, 144 N.E.2d 710, 714 (Ind. 1957)), Defendants must be able to show that Burks "[k]nowingly" accepted them, which at this point remains undone. *Headrick*, 112 N.E. at 561.

Moreover, because ratification is "in the nature of an estoppel," *id.*, the same considerations found applicable above to Defendants' equitable estoppel arguments militate against ratification here.

## Conclusion

Obviously, the evidentiary record at this stage of the litigation is sparse. We are left to rely on asserted averments and generalized allegations. The fundamentally context-dependent nature of Defendants' agency, estoppel, and ratification arguments require fact-finding as to the parties' course of dealing before, during, and after Ash's signing of the Franchise Agreement. If, at the conclusion of such fact-finding, the Court is satisfied

that an agreement to arbitrate was made, the case will be stayed in its entirety and Plaintiffs compelled to arbitration, if they continue to resist it. We are at this juncture a great distance from that point.

### Order

For the reasons given above:

Defendants' motions to stay, Dkts. 13, 29, are GRANTED IN PART.

The case is STAYED except as to those issues identified above. As to those issues, pretrial discovery will proceed according to a schedule to be set by Magistrate Judge Mark J. Dinsmore. A trial date on these preliminary issues will be set by further order of the undersigned.

Defendants' motion to strike Burks's unsigned affidavit from Plaintiffs' opposition, Dkt. 23, is GRANTED.

Plaintiffs' motion to amend its opposition with Burks's signed affidavit, Dkt. 25, is GRANTED.

IT IS SO ORDERED.

Date: 2/25/2019

_\[signature\]_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Josh F. Brown
COHEN GARELICK & GLAZIER
josh@indyfranchiselaw.com

James R. Cummins
CUMMINS LAW, LLC
jcummins@cumminslaw.us

Renee A. Infante
CUMMINS LAW, LLC
rinfante@cumminslaw.us

Stephanie Maris
COHEN GARELICK & GLAZIER
stephanie@indyfranchiselaw.com

Julie R. Murzyn
O'NEILL MCFADDEN & WILLETT LLP
jmurzyn@omwlegal.com

Steven E. Runyan
KROGER GARDIS & REGAS LLP
ser@kgrlaw.com